**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RONALD W. REICHENBACH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case number 4:11cv1551 TCM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the applications of Ronald W. Reichenbach (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned for a final disposition pursuant to the written consent of the parties.  See 28 U.S.C. § 636(c). Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

**Procedural History**

Plaintiff applied for DIB and SSI in June 2008,[1] alleging he was disabled as of July 17, 2007, by an irregular heart beat, chronic obstructive pulmonary disease (COPD), high

---

[1]Prior applications were denied in December 2007.

blood pressure, and fatigue.  (R.[2] at 102-09.)  His applications were denied initially and after a hearing held in January 2010 before Administrative Law Judge (ALJ) Jhane Pappenfus. (Id. at 5-17, 24-47.)  The Appeals Council then denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff graduated from the twelfth grade and then attended a commercial arts school. (Id. at 27.)  He had learned the printing trade by doing it.  (Id.)  He lives in a home garage. (Id.)  Asked to describe his daily activities, Plaintiff replied that he gets up between seven and nine in the morning, prepares his own breakfast using the house kitchen, cleans up, takes a shower, and then searches on the Internet for jobs, preferably printing ones.  (Id. at 32.)  He would like to take college courses in the culinary arts.  (Id.)  He is waiting to hear whether he will be interviewed about a possible printing job.  (Id. at 32-33.)

Asked by his counsel if he could physically do the printing job, Plaintiff replied that he could, albeit "maybe not as vigorously as [he] used to, it does incorporate a lot of lifting." (Id. at 33.)  He feels better after having received a pacemaker, but still gets out of breath. (Id.)

---

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

He no longer engages in his former hobby of bowling, but does continue to draw.  (Id.)
He watches television and plays video games.  (Id.)  He does not currently have a driver's
license.  (Id. at 33-34.)  He goes with the person he resides with to shop.  (Id. at 34.)  He
helps carries the bags.  (Id.)  He also cooks dinner "most nights" for the people he resides
with.  (Id.)  He does not sleep well because he needs to urinate often and because he is in a
new place.  (Id.) He goes to bed around ten or eleven at night.  (Id. at 35.)  He goes out
socially whenever asked, usually once every three weeks.  (Id.)

Plaintiff has been arrested twice for driving while intoxicated and had once placed
himself in an alcohol rehabilitation program.  (Id. at 29.)  He had also been hospitalized once
for alcohol-related reasons.  (Id. at 30.)

He was not alleging a mental impairment.  (Id. at 31.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of
the application process, documents generated pursuant to his applications, medical records,
and an assessment of his physical residual functional capacity.

When applying for DIB and SSI, Plaintiff completed a Disability Report.  (Id. at 131-
40.)  He is 5 feet 11 inches tall and weighs 230 pounds.  (Id. at 131.)  He is unable to work
because of an irregular heart beat, COPD, high blood pressure, and a resulting loss of energy.
(Id. at 132.)  Because of these impairments, he cannot do anything for longer than an hour
without having to sit and rest; he gets out of breath and tired when shopping; and he does not
have the energy or strength to lift and carry.  (Id.)  His impairments first bothered him on July

17, 2007; that is also when he became unable to work. (Id.) He stopped working on May 29, 2008, because he was let go.[3] (Id.) The job he had held the longest was as a pressman. (Id. at 133.) This required that he walk and stand for eight hours each every day; sit, climb, and crawl each for one hour; stoop, kneel, crouch, and reach each for seven hours; handle, grab, or grasp big objects for six hours; and write, type, or handle small objects for four hours. (Id.) Daily he would have to lift fifty to sixty pounds of paper and carry it about thirty feet. (Id.) The heaviest weight he lifted was fifty pounds or more. (Id.) He takes fourteen medications; none have any side effects. (Id. at 138.)

Plaintiff also completed a Function Report. (Id. at 146-53.) He reported that he sometimes gets out of breath when taking care of his personal grooming. (Id. at 147.) It takes him longer to do household chores and his meals are sandwiches or warmed frozen dinners. (Id. at 148.) Because of his heart problems, he is in the process of changing his diet. (Id.) His impairments adversely affect his abilities to lift, squat, stand, walk, climb stairs, remember, see, and complete tasks. (Id. at 152.) He attributes a decrease in his vision to age. (Id.) How long he can walk depends on the weather. (Id.) His ability to concentrate is not affected. (Id.) He follows written and spoken instructions "[f]ine." (Id.) On a separate questionnaire, Plaintiff reported that he has a valid driver's license and can drive. (Id. at 155.)

After the initial denial of his applications, Plaintiff competed a Disability Report - Appeal form. (Id. at 157-63.) He had had a pacemaker put in in September 2008 and now

---

[3]Plaintiff does not explain the inconsistency between being unable to work in July 2007 and stopping work ten months later.

has to watch what he lifts.  (Id. at 157.)  It takes him longer to complete tasks, and he stays

home more frequently.  (Id. at 161.)

Also before the ALJ were medical records for Plaintiff, summarized below in

chronological order.[4]

Plaintiff was admitted to Christian Hospital Northeast on July 17, 2007, after being

found unresponsive at home.  (Id. at 176-85, 728-33.)  He had lost his mother a few months

earlier and his job recently, and he had been drinking "on a fairly daily basis."  (Id. at 179.)

He had been smoking one and one-half packs of cigarettes a day, but a friend indicated he

had recently quit.  (Id. at 179, 181, 185.)  He was admitted with diagnoses of acute

respiratory failure; cardiogenic shock with congestive heart failure/pulmonary edema and

bilateral pleural effusions; acute oliguric renal failure; probable pneumonia; hyperkalemia;

hyponatremia; atrial fibrillation with rapid ventricular response; chronic alcohol abuse; and

chronic liver disease with probable cirrhosis and ascites.  (Id. at 180.)  He was discharged on

August 22 with diagnoses of cardiomyopathy[5]; pneumonia; atrial fibrillation with rapid

ventricular response, "ventricular rate currently fairly well-controlled"; chronic alcohol

_____

[4]Because Plaintiff's arguments in support of his complaint do not focus on the medical record,
the Court has briefly summarized only those records generated after his alleged disability onset date.
Thus, records for such illnesses as his bladder cancer, diagnosed in January 2006, are not summarized.
(See e.g. id. at 312-42, 520-21, 551-83, 589-93, 608-38, 647-56, 740-98.)  Also not included are
records from Bridgeway Behavioral Health, Inc., of Plaintiff's participation in an alcohol rehabilitation
program from November 15, 2005, to December 15, 2005, when Plaintiff dropped out of the
program.  (See id. at 801-10.)

[5]Cardiomyopathy is a "[d]isease of the myocardium[,]" which is "[t]he middle layer of the hart,
consisting of cardiac muscle." Stedman's Medical Dictionary, 282, 1167 (26th ed. 1995) (Stedman's).

abuse; chronic liver disease with cirrhosis, ascites, coagulopathy, thrombocytopenia,[6] and hyperammonemia; COPD; pseudoaneurysm of the right femoral artery; and anemia.  (Id. at 177.)  His acute respiratory failure, cardiogenic shock, and acute oliguric renal failure had all resolved.  (Id.)

On discharge, Plaintiff was admitted to The Rehabilitation Institute of St. Louis "for intensive physical and occupational therapy to improve his level of function with mobility, transfers, and performance of [activities of daily living] . . . "  (Id. at 725-26.)  At discharge on September 6, Plaintiff was able to walk farther than 1,000 feet using a straight cane, change positions from sitting to standing and the reverse "with modified independence," and perform activities of daily living "with modified independence."  (Id. at 726.)  He could sit and move about in bed with independence.  (Id.)

On September 4, Joshua Glaser, M.D., diagnosed Plaintiff with a small pseudoaneurysm in his right groin.  (Id. at 280.)  The plan was to do serial duplex imaging of the groin every four weeks to see if resolved; if not surgical intervention would be considered.  (Id.)

Plaintiff saw Penumacha Vanaja, M.D., on September 10, for a physical exam.  (Id. at 286-89.)  Dr. Vanaja described Plaintiff as "sick looking" and "pale."  (Id. at 288.)  He also noted that Plaintiff had reduced his smoking two weeks earlier and had stopped drinking three weeks earlier.  (Id. at 287.)  He diagnosed Plaintiff with congestive heart failure (CHF),

---

[6]Thrombocytopenia is "[a] condition in which there is an abnormally small number of platelets in the circulating blood."  Stedman's at 1808.

"status not know[n]," a hematoma at his calf, and chronic alcoholism. (Id. at 289.) Plaintiff was to continue on his current medications and return in six weeks. (Id.)

Two weeks later, he informed his primary care physician, Heather Jordan, M.D., with the Mercy Medical Group, that he was experiencing "intermittent a-fib." (Id. at 308, 539.) He was using a cane when climbing stairs. (Id.)

Plaintiff complained of chest pains for the past day when he saw Dr. Jordan on January 2, 2008. (Id. at 307, 536.) She sent him to the emergency room at St. John's Mercy Medical Center (St. John's). (Id. at 348-60.) A chest x-ray was normal. (Id. at 359, 508, 588, 641.) He was discharged on January 7 with instructions to follow-up with Dr. Jordan and to inform Dr. Jordan that his Coumadin dosage was to be increased. (Id. at 354.) It was. (Id. at 306.)

Complaining of progressive shortness of breath, Plaintiff went to the St. John's emergency room on April 21, was found to be in congestive heart failure, and admitted. (Id. at 364-87, 394-96, 509-13, 597-601, 640, 708-09, 711-12, 715, 719.) Chest x-rays revealed a right lower lobe infiltrate and effusion. (Id. at 640.) After being treated with various medications, Plaintiff was discharged on April 27 with diagnoses of nonischemic dilated biventricular cardiomyopathy with resultant acute CHF; atrial fibrillation with rapid ventricular response, with a currently controlled rate; COPD exacerbation; alcoholic liver disease; thrombocytopenia; alcohol and tobacco abuse; right pleural effusion; iron deficiency anemia; and stable depression. (Id. at 364, 711-12.) His discharge activity was to be "as tolerated." (Id. at 366.)

Plaintiff consulted James A. Stokes, M.D., with Mercy Cardiology Clinic, on June 11 as a follow-up from his April hospitalization.  (Id. at 393, 694.)  At the next visit, on June 18, Dr. Stokes added a dosage of Coreg to the prescription given a week earlier.  (Id. at 392.)

The following month, on July 11, Plaintiff returned to St. John's with complaints of chest pain that had begun the previous evening after an argument with a bill collector, the consumption of half a pint of whiskey, and the smoking of  few cigarettes.  (Id. at 398-403, 683-93, 697-702.)  After he woke up that morning, the chest pain was still there and remained present after Plaintiff drank the rest of the whiskey.  (Id. at 402.)  A chest x-ray did not reveal any acute disease.  (Id. at 403.)  Three days later, Plaintiff was discharged.  (Id. at 399.)  On discharge, Ditiazem was added to his other twelve medications.[7]  (Id. at 399.)  His activities were restricted to "as tolerated."  (Id.)

After twice losing consciousness at home, Plaintiff went to St. John's on September 11.  (Id. at 434-39, 657-62, 664-66, 676-81.)  He was admitted with a diagnosis of atrial fibrillation with a rapid ventricular rate and COPD exacerbation.  (Id. at 436.)  He was treated with medication, rehydrated, and given a pacemaker.  (Id.)  He was discharged fourteen days later in a stable condition.  (Id.)

Plaintiff was admitted to St. John's on March 1, 2009, with pneumonia and septic shock due to pneumonia, treated with intravenous antibiotics and fluids, and discharged six days later in stable condition.  (Id. at 495-97, 503-05.)

---

[7]These medications included Digoxin, Iron, Coumadin, Sprionolactone, Lasix, Coreg, Lisinopril, Thiamine, Folic Acid, Albuterol, Spiriva, and Advair Diskus.

When Dr. Jordan saw Plaintiff on June 26, he reported that he had been feeling better since having the pacemaker. (Id. at 468-73.) He was also feeling better since having been hospitalized two months earlier for pneumonia and a partially collapsed lung. (Id. at 468.) He was looking for a job and hoped to hear about a new one that day. (Id.)

Plaintiff underwent a pharmacologic stress myocardial perfusion study on January 8, 2010. (Id. at 812-13.) The study revealed "a large size, moderate intensity perfusion defect involving the basal, mid and apical inferior segments suggesting a region of myocardial infarction"; "[a]bnormal gated SPECT examination[;] dilated left ventricle, inferior and lateral hypokinesis[;] and [e]stimated LVEF 45 %." (Id. at 812.)

The ALJ also had before him an assessment of Plaintiff's physical residual functional capacity and a note from Dr. Jordan.

In August 2008, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Christine Cruzen, a "single decisionmaker." (Id. at 427-32.) The primary diagnoses were nonischemic cardiomyopathy and atrial fibrillation; the secondary diagnoses were COPD and alcohol liver disease; another alleged impairment was hypertension. (Id. at 427.) These impairments resulted in exertional limitations of Plaintiff being able to lift or carry ten pounds, occasionally or frequently; stand or walk for at least two hours in an eight-hour workday; and sit for approximately six hours in an eight-hour workday. (Id. at 428.) His ability to push and pull was otherwise unlimited. (Id.) He had no postural, manipulative, visual, or communicative limitations. (Id. at 429-31.) He had

environmental limitations of needing to avoid humidity, respiratory irritants, and hazards. (Id. at 431.)

Dr. Jordan wrote a note in September 2008 that she was treating Plaintiff for CHF and COPD. (Id. at 668.) "He is unable to work due to his medical conditions." (Id.)

## The ALJ's Decision

Analyzing Plaintiff's applications under the Commissioner's five-step evaluation procedure, the ALJ first found that he met the Act's insured status requirements through December 31, 2012, and had not engaged in substantial gainful activity since the alleged onset date of July 17, 2007. (Id. at 9-10.) At step two, the ALJ found that Plaintiff had severe impairments of chronic liver disease with cirrhosis and chronic alcohol abuse; atrial fibrillation; cardiomyopathy; thrombocytopenia; and COPD. (Id. at 10.) He had a history of acute renal failure, pneumonia, CHF, pacemaker surgery, and bladder cancer. (Id.) After summarizing the relevant medical records, the ALJ found at step three that these impairments did not, singly or in combination, meet or medically equal an impairment of listing-level severity. (Id. at 11-13.)

The ALJ then assessed Plaintiff's residual functional capacity (RFC). (Id. at 13.) She concluded that Plaintiff had the RFC to perform the full range of medium work.[8] (Id.) She reviewed Plaintiff's hearing testimony and his claims of disabling heart problems and COPD. (Id. at 13-14.) "Based on the medical evidence, [Plaintiff's] heart problems were treated and

---

[8]Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects up to 25 pounds." 20 C.F.R. § 404.1567(c). If someone can do medium work, he can do sedentary or light work. Id.

controlled with medication.  However, the underlying cause was his alcoholism."  (Id. at 14.)
Plaintiff's continued smoking against medical advice, the ALJ concluded, "undermines the
professed seriousness of his COPD and undermines his allegation of a severe disabling
impairment."  (Id. at 14-15.)

The ALJ outlined various inconsistencies in the record that she found to be detractors
from his credibility,[9] including filing for unemployment benefits and continuing to look for
a job; his noncompliance with his doctors' recommendations; and the extent of his daily
activities.  (Id. at 15-16.)

With his RFC, Plaintiff could return to his past relevant work as a printing pressman.
(Id. at 16.)  He was not, therefore, disabled within the meaning of the Act.  (Id.)

### Additional Records Before the Appeals Council

After the ALJ rendered her adverse decision, Plaintiff submitted additional medical
records to the Appeals Council.

In August 2010, Plaintiff underwent a pulmonary function test.  (Id. at 817-27.)  His
Plaintiff's forced vital capacity (FVC) was mildly decreased; his forced expired volume in
one second (FEV-1) and diffusing capacity were moderately decreased.  (Id. at 817.)  His
total lung capacity was normal.  (Id.)  The "[m]easurement of inspiratory and expiratory
pressures [were] decreased, suggesting a possible component of muscle weakness versus
suboptimal effort."  (Id.)  It was noted that Plaintiff's cardiac problems were "doing well on

---

[9]The Court notes that Plaintiff does not challenge in this action the ALJ's adverse credibility
determination.

current medications"; his recent ejection fraction was 55 percent.[10]  (Id. at 822.)  His

diagnoses were COPD; CHF, unspecified; atrial fibrillation; and tobacco abuse.  (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is

"unable to engage in any substantial activity by reason of any medically determinable

physical or mental impairment," which must last for a continuous period of at least twelve

months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment

suffered must be "of such severity that [the claimant] is not only unable to do his previous

work, but cannot, considering his age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national economy."   42 U.S.C. §

1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738

(8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572

F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate

analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First,

the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R.

§§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a

severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is

_____

[10]"A normal [left ventricular] ejection fraction is 55 to 70 percent."  Martha Grogan, M.D.,
E j e c t i o n   f r a c t i o n :   W h a t   d o e s   i t   m e a s u r e ? ,
http://www.mayoclinic.com/health/ejection-fraction/AN00360 (last visited Sept. 10, 2012).

"any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. Accord **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011); **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006). Conversely, "[a]n impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to work," i.e., "[it] would have no more than a minimal effect on the claimant's ability to work . . . ." **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." **Id.** at 708 (internal citations omitted).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted).

- 13 -

Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011). "'The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. [A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)) (second alteration in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524, which cited Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Wagner**, 499 F.3d at 851 (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record

which caused the ALJ to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. §§ 404.1520(e), 416.920(e).  The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  **Partee**, 638 F.3d at 863 (quoting Goff

v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  "If, [however,] after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789).  See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred (1) when assessing his RFC by not including the non-exertional limitations outlined in the PRFCA and (2) by not first determining whether Plaintiff was disabled before finding that his alcoholism was a contributing factor.  The Commissioner disagrees.

Plaintiff correctly notes that the PRFCA includes a lifting restriction greater than that included in the ALJ's RFC assessment and an environmental restriction not included at all in the RFC.  Plaintiff contends that the ALJ's failure to include these restrictions violates Social Security Ruling 96-6p.

- 16 -

"Social Security Ruling 96-6p . . . notes that 'longstanding policy requires that the judgment of a physician . . . designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge . . . must be received into the record as expert opinion evidence and given appropriate weight.'" **Carlson v. Astrue**, 604 F.3d 589, 593 (8th Cir. 2010) (quoting Social Security Ruling 96-6p, 1996 WL 362203 (July 2, 1996)) (all but first alteration in original).   The Ruling explains this deference as follows:  "Because State agency *medical and psychological consultants and other program physicians and psychologists* are experts in the Social Security disability programs, the rules . . . require administrative law judges . . . to consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining *physicians and psychologists*." Social Security Ruling 96-6p, 1996 WL 34467 (emphasis added).

Ms. Cruzen, however, was a "single decisionmaker."  Under a test of modifications to the disability determination procedures, a single decisionmaker "will make the disability determination after any appropriate consultation with a medical or psychological consultant." 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decisionmaker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).  A single decisionmaker is not considered a medical source.  See **Gaston v. Astrue**, 2012 WL 3045685, *2 (W.D. Mo. July 25, 2012).  See also **Kettering v. Astrue**, 2012 WL 3871995, *21 (E.D. Mo. Aug. 13, 2012) (finding that ALJ did not err by failing to

specify weight accorded opinion of "single decisionmaker" as "single decisionmaker" was a disability counselor and not an acceptable medical source as defined by the regulations). Indeed, it is error for an ALJ to consider a PRFCA by a single decisionmaker.  See **Andreatta v. Astrue**, 2012 WL 1854749, *10 (W.D. Mo. May 21, 2012) (remanding case in which ALJ may have relied on PRFCA completed by single decisionmaker and referencing an agency policy that ALJs are not to evaluate in their opinions assessments by single decisionmakers).

Plaintiff next argues that the ALJ erred by finding that his impairments were not severe because of his alcoholism rather than following agency policy and not determining first whether the impairments were severe and, if so, then whether they would remain so in the absence of his alcoholism.  The Commissioner counters that the ALJ properly considered Plaintiff's alcohol abuse when evaluating his credibility and assessing his RFC.

"'An individual shall not be considered disabled for purposes of this title [Title II] if alcoholism . . . would (but for this subparagraph) be a contributing factor to the Commissioner's determination that the individual is disabled.'" **Kluesner v. Astrue**, 607 F.3d 533, 537 (8th Cir. 2010) (quoting 42 U.S.C. § 423(d)(2)(C) and noting that 42 U.S.C. § 1382(c)(a)(3)(J) has a similar provision for Title XVI).  Thus, "[i]n the case of alcoholism . . . , an ALJ must first determine if a claimant's symptoms, regardless of cause, constitute disability." **Id.**  Title 20 C.F.R. §§ 404.1535 and 416.935(b) outline the procedure to be followed when there is medical evidence of alcoholism.

In the instant case, the ALJ discussed Plaintiff's alcohol abuse when (a) determining his severe impairments and (b) assessing his credibility.  When determining whether Plaintiff

had one or more severe impairments, the ALJ summarized Plaintiff's medical records, noting which hospitalizations were preceded by a bout of drinking and which included considerations of alcohol withdrawal.  Indeed, the ALJ included in her summary treatment sought by Plaintiff for alcohol dependence two years before his alleged disability onset date.[11] The first impairment found to be severe was "chronic liver disease with cirrhosis and chronic alcohol abuse."  (R. at 10.)

In **Brueggemann v. Barnhart**, 348 F.3d 689, 694 (8th Cir. 2003), the ALJ had, as in the instant case, failed to cite the Commissioner's mandatory procedures for accounting for a substance abuse disorder in the disability determination proceeding.  The Commissioner argued that the oversight "was one of 'opinion writing' rather than law.'"  **Id.**  The Eighth Circuit Court of Appeals disagreed, finding that the failure "accurately reflected [the ALJ's] failure to follow the procedures prescribed" by the Commissioner.  **Id.**  The court held that the ALJ must first determine whether a claimant is disabled "without segregating out any effects that might be due to substance abuse disorders."  **Id.**  "The inquiry . . . concerns strictly symptoms, not causes . . . ."  **Id.**  Here, the ALJ consistently included references to Plaintiff's alcohol abuse in her discussion of the causes of his impairments.[12]  If, as the Commissioner argues, the abuse was only considered when evaluating Plaintiff's credibility

---

[11]See note 4, supra.

[12]For instance, when summarizing Plaintiff's April 2008 hospitalization, the ALJ included references to Plaintiff being started on medications for alcohol withdrawal, to Plaintiff having drunk half a fifth of whiskey per day and to being a binge drinker three to four days a week, and to having been fired from his job for alcohol abuse.

and RFC, it would not have been so referenced and a detailed summary of a 2005 alcohol rehabilitation program would not have been included in the section discussing Plaintiff's severe impairments.

An argument that the ALJ had erred by failing to apply the correct legal standard with regard to the claimant's alcohol abuse was rejected in **Fastner v. Barnhart**, 324 F.3d 981, 986 (8th Cir. 2003.)  In that case, as in the instant case, the ALJ had included the claimant's alcohol abuse as an impairment and had not found any of the claimant's severe impairments to be disabling.  **Id.** at 984, 986. In that case, however, the ALJ also found that "alcohol would be a contributing factor material to the disability determination and that, absent alcohol abuse, [the claimant's] other impairments would not be disabling." **Id.** at 986.  Thus, the ALJ had reached the proper final inquiry and there was no reversible error.

In the instant case, as noted above, the ALJ never cited the Commissioner's procedure for determining whether alcoholism was a contributing factor.  Although, as noted by the Commissioner, the ALJ also did not find any of Plaintiff's impairments to be severe, it is not evident from her decision whether she improperly considered his alcohol abuse when inquiring about the causes of his impairments and when determining the severity of his impairments.

For the foregoing reasons, the case must be remanded to the Appeals Council with directions that it be remanded to the ALJ for a proper inquiry into whether Plaintiff's impairments are severe and, if so disabling, and, if so, whether his alcoholism is a contributing factor.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED

and this case is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for the further,

limited proceedings as set forth above.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  13th  day of September, 2012.